**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

<table>
<tr><td></td><td>*</td><td></td></tr>
<tr><td>BRENDAN MOON,</td><td>*</td><td></td></tr>
<tr><td>Plaintiff,</td><td>*</td><td></td></tr>
<tr><td>v.</td><td>*</td><td>Civil No. 21-2750-BAH</td></tr>
<tr><td>VERITAS TECHNOLOGIES LLC,</td><td>*</td><td>**REDACTED**</td></tr>
<tr><td>Defendant.</td><td>*</td><td></td></tr>
</table>

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

**<u>MEMORANDUM OPINION</u>**

Brendan Moon ("Moon or "Plaintiff") brought suit against Veritas Technologies LLC ("Veritas" or "Defendant") alleging breach of contract, violations of the Maryland Wage Payment and Collection Law ("MWPCL"), and quantum meruit/unjust enrichment.  ECF 2 (complaint). Pending before the Court is Defendant's motion for summary judgment (the "Motion").  ECF 83. The unredacted memorandum in support of the Motion, as well as numerous exhibits, were filed under seal.  ECF 84.  Plaintiff filed an opposition, ECF 96,[1] and Defendant filed a reply, ECF 103.[2] All filings include memoranda of law and exhibits.[3]  The Court has reviewed all relevant filings and finds that no hearing is necessary.  *See* Loc. R. 105.6 (D. Md. 2023).  Accordingly, for the

---

[1] Plaintiff first filed his opposition to summary judgment at ECF 94.  Plaintiff then submitted supplemental correspondence correcting the submission, which contained an incorrectly labeled exhibit.  ECF 95.  Plaintiff then re-filed his opposition to summary judgment.  ECF 96.

[2] Plaintiff also filed an unredacted memorandum in opposition to the motion, as well as numerous exhibits, under seal.  ECF 97.  Additionally, Defendant filed an unredacted reply in support of summary judgment, as well as exhibits, under seal.  ECF 104.

[3] The Court references all filings by their respective ECF numbers and page numbers by the ECF-generated page numbers at the top of the page.

reasons stated below, Defendant's Motion, ECF 83, is **GRANTED**.  In addition, and for the reasons stated below, three pending motions to seal, ECFs 85, 98, 105, are also **GRANTED**.[4]

## I.    BACKGROUND

Veritas is a company that specializes in data management software for private companies and government entities.  ECF 83-1, at 6.[5]  Plaintiff, Brendan Moon, worked for Veritas as a Public Sector Account Manager from May 9, 2014, until October 8, 2021.  ECF 83-3 (offer letter), at 2–4; ECF 83-4 (resignation email), at 2.  Moon worked remotely from his home in La Plata, Maryland.  ECF 84-12 (Moon Dep.), at 4, 7:3–4, at 8–9, 29:21–30:1.

Veritas generates revenue from the sale of new products/software licensing and the renewal of licensing agreements associated with previously sold products/software.  ECF 83-1, at 7.  Veritas assigned Moon specific public sector accounts, most of which were federal government agencies such as the Social Security Administration (SSA) and the Internal Revenue Service (IRS).  ECF 84-13 (Youngquist Dep.), at 8, 25:17–20; ECF 84-12, at 46, 180:3–8.  Moon's professional duties included scheduling meetings with his customers, solving customer problems, negotiating with third party distributors, resellers, and Veritas internal teams, troubleshooting, and presenting demo products to pique customer interests.  ECF 97-4 (Vesek Aff.), at 2–3 ¶¶ 9–10, 17–23; ECF 97-3 (Hyde Dep.), at 7, 29:9–14.

---

[4] Due to the granting of the motions to seal, many of the filings referenced in this opinion are sealed.  Though the Court has drafted this opinion to avoid as much sensitive material as possible, the memorandum opinion will be initially filed under seal.  The parties shall have twenty-one (21) days from its issuance to file a position, under seal, on what portions of the opinion must remain under seal.  The Court intends to issue a public version of this opinion with necessary redactions after reviewing any submissions from the parties.  The Court's accompanying implementing Order will not be filed under seal.

[5] The Court references the parties' redacted briefs in this opinion, ECFs 83, 96, 103.

In Moon's offer letter, Veritas indicated that it would pay him a base salary of ███████ with opportunity to "earn variable incentive compensation target at ███████ per year (annualized), at ████ performance" provided Moon accepted and complied with the "Incentive Compensation Plan." ECF 83-3, at 2. The offer letter indicated that the "[d]etails of the Incentive Plan and quota sheet will be provided by [Moon's] manager." *Id.*

In early 2020, Moon had begun working on the SSA account when he discovered that "it was unlikely that [the Blanket Purchase Agreement ("BPA")] was going to be renewed [by the SSA] because they were very unhappy with Veritas" and believed that "the pricing that they were getting from Veritas was not good, that it was far above competitor pricing that they had been told they should . . . expect." ECF 84-12, at 15, 54:12–18. On March 1, 2020, the SSA refused to renew the BPA, preventing any license purchases. *Id.* at 18, 69:16–18. Moon then began engaging in sales activity "by scheduling numerous meetings with the SSA and relevant internal teams, including the deals and renewals teams, and directed his systems engineer to maintain rigorous training sessions." ECF 96, at 9 (citing ECF 97-4, at 3 ¶ 21; ECF 97-3, at 19, 75:7–15). In March 2021, the SSA awarded Veritas a five-year BPA. ECF 97-6, at 130–40 ("[A] five-year volume [BPA] [was] finalized in March 2021."); ECF 97-6, at 21; *see also* ECF 97-4, at 2 ¶ 15 ("Securing a new BPA was of significant importance because, without the BPA, the SSA would make no new purchases and would likely phase out the products they did have.").

On May 19, 2021, Carahsoft, an authorized distributor and reseller of Veritas products, received an order from SSA valued at $7.36 million ("the SSA Deal"). ECF 97-6, at 183; *id.* at 120–21; ECF 84-7, at 2. Moon testified he did not know the order was coming and "[t]he quantity was definitely unexpected." ECF 84-12, at 40, 154–55:15–1. He also indicated that Veritas "should call SSA and make sure there's not been some sort of mistake in terms of quantity before

[doing] anything to process it." *Id.* at 40, 155:6–10.  One day later, Moon emailed Hyde, "while this [the SSA order] is GREAT NEWS, it does of course raise the question about why I didn't have it forecasted."[6]  ECF 83-18, at 2; *see also* ECF 84-12, at 44, 172–73:19–4.  Hyde similarly testified that she did not know about the order.  ECF 97-3, at 46, 182:8–22, 183:1–20.  The deal was undisputedly significant for Veritas, and Moon was congratulated for his contributions to securing the BPA, which enabled the May 2021 deal.  ECF 97-6, at 135 ("Lots of work by Brendan Moon."); *id.* at 140 ("Brendan Moon the rep saved the day by locking in the customer for 5 years[.]"); *id.* at 209 ("Congratulations to Brendan and Dan . . .you've made the news!!").

At the beginning of each fiscal year, Veritas' Sales Management team develops and assigns an annual quota to each "territory."  ECF 84-16 (O'Connor Dep.), at 17, 65:10–16; ECF 84-3 (FY22 Role-Based Sales Compensation Plan), at 2.  Two of Moon's supervisors, Carolyn Hyde and Kevin Youngquist, worked together to set Moon's fiscal year 2022 ("FY22") quota.  ECF 84-13, at 29, 106:3–10.  Once a quota is set and approved by upper management, subsequent quota changes required action from Veritas' Compensation Exception Committee ("CEC").  *Id.* at 39, 149:6–17.  The CEC is a group of management level employees and/or their designees who approve compensation plan modifications.  ECF 84-14 (Ginestet Dep.), at 6, 20:12–13; ECF 84-1 (FY22 Incentive Compensation General Terms and Conditions), at 5.

---

[6] Veritas requires account managers to input business opportunities into a sales database called Odyssey Sales Cloud ("OSC").  *See* ECF 84-12, at 58, 227:13–18; ECF 84-2, at 10 ("Use of OSC for the sales organization is mandatory.").  Account managers should update the percentage associated with a business opportunity ███████████████████████████████████████

████████████████████████████████████████████████████████  ECF 83-1, at 8 (citing ECF 84-13, at 21, 76:5–9; ECF 97-3, at 22, 89:1–17; ECF 84-2, at 10 ("Sales opportunities must be properly entered into OSC")).

On June 2, 2021, Plaintiff received the FY22 Incentive Compensation General Terms and Conditions and the FY22 Role-Based Sales Compensation Plan (collectively "the Plan"), effective April 3, 2021 to April 1, 2022. *See* ECF 84-1, at 2; ECF 84-3, at 2; ECF 97-6, at 181. Moon's FY22 Plan set his Measure 1 quota at ███████ and his Measure 2 quota at ███████.[7] ECF 97-6, at 2; ECF 84-12, at 36, 139:18–21. As relevant here, with respect to Measure 1, Veritas sets quota ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████ ECF 83, at 9 (citing ECF 84-13, at 14, 48:4–15, at 29, 106:17–22).[8] Moon promptly accepted his FY22 Plan, but due to a system error, had to re-accept the Plan (the same quota), which he did on June 16, 2021. ECF 97-6, at 49; ECF 84-12, at 46, 179:2–19. Plaintiff was incentivized to exceed his quota, as doing so would increase his earnings significantly through distribution of commission payments. ECF 97-6, at 96. The Plan stated that ongoing eligibility to participate in the Plan was subject to the Plan's terms and conditions, as well as ongoing compliance with all company policies, including Veritas' code of conduct.[9] ECF 84-3, at 2; ECF 84-1, at 13, 17–18. Veritas did not "run bookings and commission reviews in April or May [the first two months of the fiscal year] because its sales

---

[7] Measure 1 concerns sales of new licenses and Measure 2 applies to recurring revenue, *e.g.,* when an existing customer renews licensing rights or purchases support/maintenance for new licenses or renewals. ECF 83-1, at 8.

[8] Specifically, Youngquist testified that Veritas ████████████████████████████████ ████ as part of setting an accurate quota. ECF 84-13, at 29, 106:18–19.

[9] The code of conduct requires employees to disclose in writing to the employee's manager and Human Resources any situation that could present a conflict of interest with the employee's role at Veritas. ECF 83-13, at 20. Veritas' conflict of interest guidance also states employees must disclose potential conflicts to their manager and in writing for Office of Ethics and Compliance review. ECF 83-14, at 3–4.

compensation data system was not yet populated and running." ECF 103, at 13 (citing ECF 84-16, at 26, 99:2–10, at 41, 160:3–21 and ECF 84-5, at 2).

On June 28, 2021, once the compensation system became active, Moon was flagged for "High Attainment."[10] ECF 84-17 (Adviento Dep.), at 27, 104:19–22; ECF 84-9, at 10–11. The report showed that, to date, Moon was at 286.27% attainment of his annual Measure 1 quota. *Id.* at 27, 103:20–104:3; ECF 84-8, at 4. Patrick Brady, Regional Sales Operations Manager of the Public Sector, reviewed Moon's quota and bookings and advised that the SSA Deal caused high attainment and noted Moon had not forecasted the deal or put it in his pipeline. ECF 84-9, at 9–11. Moon's first quarter ("Q1") attainment placed him at 545.11% of annual on-target commission ("OTC"), and 286.27% of annual Measure 1 quota. *Id.* at 6; ECF 84-8, at 4. Under his initial quota, Moon was eligible to receive ▮▮▮▮▮▮ in commissions. ECF 96, at 12 (citing ECF 97-1, at 20).

On July 26, 2021, Moon was informed that his Q1 quota and bookings were under review and that in the interim, Veritas had authorized a ▮▮▮▮▮▮ payment to Moon until the CEC reached a final decision. ECF 83-24, at 2–4; ECF 84-1, at 17; ECF 83-26, at 2–3; ECF 83-27, at 15.

Youngquist testified that Moon did not record the SSA Deal in his FY22 Q1 quarterly business review or input it into the online sales database tracker, and if he had, Youngquist would

---

[10] The Court notes that the SSA Deal had already been approved by Moon's managers at the time Plaintiff received his initial quota on June 2, 2021. However, the Sales Compensation team did not gain visibility into Moon's attainment until June 28, 2021, when the compensation system became active. ECF 84-17 (Adviento Dep.), at 27, 104:19–22; ECF 84-9, at 10–11. O'Connor testified that Section 4.1 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮. *See* ECF 84-16, at 44, 171:4– 172:13 (testifying that while the parties are ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

have set Moon's quota $5 or $6 million higher.  ECF 84-13, at 27, 101:12–19; *see also* ECF 84-9, at 5–6 (email from O'Connor asking "How far of a jump do we want to allow with this non-forecasted, non-quotaed deal?" and indicating in an earlier email that the deal "was not in the forecast or pipeline").

David O'Connor, Veritas' then Director of Operations, proposed to the CEC that Veritas increase Moon's quota by 50% of the SSA Deal.  ECF 83-31, at 3.  The CEC reviewed and approved the proposed modification on July 28, 2021.[11]  ECF 84-9, at 2; ECF 84-14, at 7, 22:16–23:2, at 14, 51:6–18.  Moon was thus eligible for ████████ in commissions for the SSA Deal and the CEC approved payment of ████████ (the amount due based on his new quotas (████████) less commissions/draws previously paid (████████).  ECF 84-11, at 2; ECF 83-30, at 2; ECF 83-27, at 17.

On August 5, 2021, Youngquist and Hyde informed Moon of the CEC's decision.  ECF 83-31, at 2.  On August 25, 2021, Veritas sent Moon his revised Incentive Compensation Plan, reflecting his new quota.  ECF 83-32, at 2.  Moon refused to accept the plan and offered to resign, believing that continuing to work for Veritas would be interpreted as acceptance of the plan.  ECF 83-33, at 2.  Moon agreed to stay employed after O'Connor told Moon that continued employment would not be deemed acceptance of the new plan.  ECF 83-34, at 2; ECF 97-1, at 16.

On August 31, 2021, in accordance with its ordinary payroll cycles, Veritas paid the CEC

---

[11] Plaintiff asserts that the CEC did not complete its review until August 4, 2021, but the only evidence Plaintiff cites to support this assertion is O'Connor's deposition testimony indicating that he does not remember when the final decision was made, ECF 84-16, at 51, 198:9–11, and his follow-up answer that it was "[p]robably the end of July, early August," and he "presume[s] it was the first week of August."  *Id.* 198:12–16.

approved sum[12] to Moon, thereby "truing him up"[13] through July 31, 2021. ECF 83-27, at 17. On

the same day, O'Connor emailed Moon an explanation of Veritas' reasons for modifying his quota.

ECF 84-5, at 2–3. Ultimately, by letter dated September 24, 2021, Moon told Veritas he did not

accept the proposed quota increase, and resigned, effective October 8, 2021. ECF 83-4, at 2.

Plaintiff acknowledges that "[e]ven though Moon did not accept the [r]evised [q]uota, Defendant

paid him commissions for the SSA Deal and all relevant deals, after he left Veritas, based upon

the [r]evised [q]uota." ECF 96, at 12. Plaintiff received ████████, but believes he earned and

was entitled to ████████ in commissions.[14] *Id.* (citing ECF 97-1, at 20).

    Plaintiff raises three claims against Veritas including: (1) breach of contract; (2) violation

of the MWPCL; and (3) quantum meruit/unjust enrichment. Veritas now moves for summary

judgment on all claims. *See generally* ECF 83.

---

[12] According to Defendant, the ████████ figure comes from total commission on deals booked by Moon through July 2021 (including the SSA Deal), minus the June 2021 ████████ ████ draw already paid in July 2021 (████████) and the May 2021 draw (████████) already paid in June 2021. ECF 83-1, at 18 n.13 (citing ECF 83-35, at 2).

[13] Veritas computes "true-ups" by calculating commissions for all Q1 transactions on a year to date basis, less draw payments already made during Q1. *See* ECF 84-16, at 28, 108:11–109:2 ("We will review compensation, and typically when we pay someone in advance or a draw, then we would true them up, meaning we would then go back and accurately calculate what payments that individual should have earned. If we paid them too much we would claw it back or put them into a negative. If we did not pay them enough we would then pay them an additional amount of monies. Sometimes that additional amount of money is what's called the true-up.").

[14] Plaintiff largely relies on Section 5.2 of the Plan in arguing he "earned" the commission from the sale as soon as the SSA Deal was finalized. Section 5.2 states that ████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████ ECF 84-2, at 6.

## II.    **LEGAL STANDARD**

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The relevant inquiry is "whether the evidence presents a sufficient disagreement to require submission to a [trier of fact] or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986).

"Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine factual dispute exists."  *Progressive Am. Ins. Co. v. Jireh House, Inc.*, 603 F. Supp. 3d 369, 373 (E.D. Va. 2022) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86 (1986)).  "A dispute is genuine if 'a reasonable jury could return a verdict for the nonmoving party.'"  *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 330 (4th Cir. 2012)). "A fact is material if it 'might affect the outcome of the suit under the governing law.'"  *Id.* (quoting *Anderson*, 477 U.S. at 248).

The Court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor, *Tolan v. Cotton*, 572 U.S. 650, 657 (2014) (per curiam); *Scott v. Harris*, 550 U.S. 372, 378 (2007), and the Court "may not make credibility determinations or weigh the evidence," *Progressive Am. Ins. Co.*, 603 F. Supp. 3d at 373 (citing *Holland v. Wash. Homes, Inc.*, 487 F.3d 208, 213 (4th Cir. 2007)).  For this reason, summary judgment ordinarily is inappropriate when there is conflicting evidence because it is the function of the factfinder to resolve factual disputes, including matters of witness credibility.  *See Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644–45 (4th Cir. 2002).

At the same time, the Court must "prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 2003)). "The existence of a mere scintilla of evidence in support of the nonmoving party as well as conclusory allegations or denials, without more, are insufficient to withstand a summary judgment motion." *Progressive Am. Ins. Co.*, 603 F. Supp. 3d at 373 (citing *Tom v. Hosp. Ventures LLC*, 980 F.3d 1027, 1037 (4th Cir. 2020)).

## III.  **ANALYSIS**

### A.    **Motions to Seal**

The Court first addresses the motions to seal. *See* ECFs 85, 98, 105. Defendant moved to seal the FY22 Plan, other select exhibits, deposition transcripts, and an unredacted copy of its memorandum in support of its motion for summary judgment, pursuant to the stipulated protective order, ECF 48, and to "protect its confidentiality and propriet[ary] business information from competitors."[15] ECF 85-1, at 4. Plaintiff does not oppose Defendant's motion to seal, ECF 98, at 1 n.1, and in fact, "incorporate[s] by reference Defendant's Motion to Seal[,]" in Plaintiff's own motion to seal an unredacted copy of Plaintiff's opposition memorandum and certain exhibits. ECF 98. Defendant contends that disclosure of the Plan, select documents produced in discovery, and deposition transcripts could hinder its ability to remain competitive in the market and operate its business given the sensitive information revealed in the documents about Veritas' business strategies and compensation structure. ECF 85-1, at 6. Additionally, Defendant maintains that

---

[15] In submitting its reply brief, Defendant also moved to file under seal an unredacted copy of its reply brief in support of summary judgment, the declaration of Kelie Ginestet, as well as select exhibits. ECF 105, at 1. Defendant relied on the same reasoning set forth in its initial motion to seal to justify sealing documents on reply.

less restrictive alternatives are not available given that the confidential information is "woven throughout" the documents. *Id.* at 7.

Under Local Rule 105.11, "[a]ny motion seeking the sealing of . . . motions, exhibits[,] or other documents to be filed in the Court record shall include (a) proposed reasons supported by specific factual representations to justify the sealing and (b) an explanation why alternatives to sealing would not provide sufficient protection."  The common law presumes that the public has a right to inspect judicial records and documents. *Stone v. Univ. of Md. Med. Sys. Corp.*, 855 F.2d 178, 180 (4th Cir. 1988).  This presumption of access, however, may be overcome if competing interests outweigh the interest in access. *Id.*

"[W]hen a district court is presented with a request to seal certain documents, it must determine two things: (1) whether the documents in question are judicial records to which the common law presumption of access applies; and (2) whether the documents are also protected by the more rigorous First Amendment right of access." *Butler v. DirectSAT USA, LLC*, 47 F. Supp. 3d 300, 316 (D. Md. 2014) (citing *In re Application of the United States for an Order Pursuant to 18 U.S.C. Section 2703(D)*, 707 F.3d 283, 290 (4th Cir. 2013)).  "[T]he non-moving party must be provided with notice of the request to seal and an opportunity to object.  This requirement may be satisfied . . . by docketing the motion reasonably in advance of deciding the issue." *Butler*, 47 F. Supp. 3d at 316 (internal quotations and citations omitted).  Before sealing, the Court must consider less drastic alternatives. *Id.*

As relevant here, a corporation "may possess a strong interest in preserving the confidentiality of its proprietary and trade-secret information, which in turn may justify partial sealing of court records." *Doe v. Public Citizen*, 749 F.3d 246, 269 (4th Cir. 2014); *see, e.g., Butler*, 47 F. Supp. 3d at 317 (holding documents can remain under seal "because they contain

confidential and proprietary business information and/or were produced from employee personnel files that contain sensitive personal and commercial information.").

The parties have complied with procedural requirements, and the Court finds that the documents and deposition testimony contain confidential and proprietary business information. Veritas has a strong interest in keeping its compensation plan confidential, the public has little use for it, and competitors could use it to Veritas' disadvantage.  Since the vast majority of the Plan documents, exhibits, and deposition testimony contains confidential information, redaction is not a viable option.  To the extent redaction was available in the parties' memoranda, the parties used redactions.  Moreover, there is no opposition to any of the motions to seal by the adverse party or any other interested party.  Quoted language from the sealed documents in the parties' redacted briefs (ECFs 83, 96, 103) will remain redacted and the select exhibits will remain sealed.  Accordingly, the motions to seal at ECFs 85, 98, and 105 are granted.

### B.    Motion for Summary Judgment

#### 1.    Breach of Contract Claim

To establish a breach of contract under Maryland law,[16] plaintiff must prove "contractual obligation, breach, and damages."  *Parkway 1046, LLC v. U.S. Home Corp.*, 961 F.3d 301, 307 (4th Cir. 2020) (quoting *Kumar v. Dhanda*, 17 A.3d 744, 749 (Md. App. 2011), *aff'd*, 43 A.3d 1029 (Md. 2012)).  Thus, the Court will first consider whether a contract existed that could be breached.

---

[16] "A federal court sitting in diversity applies the substantive law of the state in which it sits." *Megaro v. McCollum*, 66 F.4th 151, 159 n.4 (4th Cir. 2023) (citing *Volvo Const. Equip. N. Am., Inc. v. CLM Equip. Co., Inc.*, 386 F.3d 581, 599–600 (4th Cir. 2004)).  As to contract claims, Maryland applies the law of the state in which the contract was formed ("*lex loci contractus*"), unless the parties to the contract agreed to be bound by the law of another state.  *See, e.g., Am. Motorists Ins. Co. v. ARTRA Group, Inc.*, 659 A.2d 1295, 1301 (1995).  The parties both apply Maryland law in their briefs, therefore the Court will also assume that Maryland law applies.

####### i.    *There is a Valid Contract.*

Formation of a valid contractual obligation "requires mutual assent (offer and acceptance), an agreement definite in its terms, and sufficient consideration." *Spaulding v. Wells Fargo Bank, N.A.*, 714 F.3d 769, 777 (4th Cir. 2013) (quoting *CTI/DC, Inc. v. Selective Ins. Co. of Am.*, 392 F.3d 114, 123 (4th Cir. 2004)). For sufficient consideration, there must be a "benefit to the promisor or a detriment to the promisee." *Mould v. NJG Food Serv. Inc.*, 986 F. Supp. 2d 675, 678 (D. Md. 2013) (citing *Cheek v. United Healthcare of Mid-Atl., Inc.*, 835 A.2d 656, 661 (Md. 2003)). Defendant argues that "[t]he FY22 Plan and the record clearly and unambiguously disclaims any intent to create binding contractual obligations such that there can be no mutual assent and thus no contract and nothing obtained in discovery changes this fact." ECF 83-1, at 20 (citing ECF 84-13, at 23, 84:14 ("adjustments could be made at any time"); ECF 84-14, at 71, 279:17–280:1 ("[W]e can change retroactively or prospectively comps bookings, credit quota, draws and advances . . . until the plan closes at the end of the year."); ECF 97-3, at 19, 77:1–3 ("A quota could be revised, as I understand it, for just about anything. That's why it's written into the comp plan[.]"); ECF 84-12, at 74, 290:20–291:2 ("Now, could Veritas change my quota going forward to impact future payments? I would agree that they could. They wanted to raise my quota to then dilute value of future sales, I believe that they could.")). According to Defendant, there was no mutual assent because Defendant had "absolute authority to change the Plan at any time, prospectively or retroactively." ECF 83-1, at 20 (citing ECF 84-1, at 11–15).

Meanwhile, Plaintiff argues that he was "offered to participate in the Plan through his [o]ffer [l]etter, which specified three types of compensation: salary, variable incentive compensation, and stocks," ECF 97, at 13 (citing ECF 83-3, at 2–3), and the letter "guaranteed payment under the Plan as the offer letter stated that Plaintiff was entitled to 'Guaranteed Payment.'" *Id.* (citing ECF 83-3, at 2 and ECF 84-12, at 7, 19:6–13). As such, the Plan was

13

allegedly "a 'significant component of the employment offer' accepted by Plaintiff, and by accepting that offer and working pursuant to its terms, the parties entered into a contract." *Id.* at 15 (citing *In re Nat'l Energy & Gas Transmission, Inc.*, 351 B.R. 323, 337 (Bankr. D. Md. 2006)). Defendant responds that the "[o]ffer [l]etter defers management of the incentive program to the Incentive Compensation Plan and expressly conditions [] Moon's eligibility on accepting and complying with its terms." ECF 103, at 7. Defendant also asserts that "the 'guaranteed payment' is a guarantee that Symantec would pay [] Moon a non-recoverable draw within the first 65 days of his employment in 2014," *id.* at 6, but that "[p]ayment of a non-recoverable draw does not guarantee future commissions and the remainder makes clear that Symantec reserved the absolute discretion to determine incentive amounts." *Id.* (citation omitted).

To count as consideration, a promise must "constitute[] a binding obligation." *Cheek*, 835 A.2d at 661; *see also Allegis Group, Inc. v. Bero*, 689 F. Supp. 3d 81, 116 (D. Md. 2023). "Without a binding obligation, sufficient consideration does not exist to support a legally enforceable agreement." *Cheek,* 835 A.2d at 661. If the promise "does not actually bind or obligate the promisor to anything," it is an illusory promise, and thus "cannot constitute consideration." *Hill v. Peoplesoft USA, Inc.*, 412 F.3d 540, 543 (4th Cir. 2005) (citing *Cheek*, 835 A.2d at 661). "Longstanding Maryland legal principles recognize that no enforceable contractual obligation is created when an employer offers employees a bonus for doing that which an employee is already required to do pursuant to the terms of the engagement of employment." *Windesheim v. Verizon Network Integration Corp*., 212 F. Supp. 2d 456, 462 (D. Md. 2002). However, where there is evidence that an incentive plan is "an integral part of the [employees'] compensation for the work they performed," and a court can "infer from the record" that a "program awarded [employees] in exchange for performance above and beyond that required by the employment agreements," there

is sufficient consideration. *See In re Nat'l Energy & Gas Transmission, Inc.*, 351 B.R. at 339 ("Traders were awarded bonuses for 'superperforming,' not for showing up to work.").

As an initial matter, the Court agrees with Defendant that the offer letter merely "gave []
Moon the opportunity to participate in the incentive program." ECF 103, at 7. The offer letter indicates that Plaintiff "will be eligible to earn variable incentive compensation targeted at ███

████████████████████████████████████████████████████████████████████████████

████████████████████████████████" ECF 83-3, at 2. Thus, Plaintiff was entitled to opt into the incentive program by accepting the terms each year, ECF 84-1, at 18, which included, as relevant here, express terms allowing Veritas to adjust quotas affecting commission amounts. *Id.* at 12, 13–15. The offer letter did not, however, entitle Plaintiff to a specific sum, or even guarantee payment, given that lack of acceptance of the Plan terms could lead to ineligibility for the incentive compensation program.[17] *Id.* at 18; *see also* ECF 84-3, at 2 ("Plan participants are not guaranteed any sum of commissions or bonus payments."). As such, the offer letter, by itself, does not create a contract with respect to the compensation at issue.

However, the offer letter, taken together with the Plan, formed a binding contract because it was an integral part of Plaintiff's compensation and rewarded him for work beyond that which was already compensated by the base salary. *See In re Nat'l Energy & Gas Transmission, Inc.*, 351 B.R. at 337 (finding an implied-in-fact contract where plaintiffs received offer letters from

---

[17] Plaintiff avers that "[t]he Offer Letter makes clear that commissions are earned as part of Plaintiff's compensation, and that the Plan's incentive payments are a 'guaranteed' component of compensation that Veritas 'will' pay its employee." ECF 96, at 14. The Offer Letter's reference to "guaranteed payment," is a guarantee that Plaintiff would receive a non-recoverable draw within the first 65 days of his employment in 2014. *See* ECF 83-3, at 2. With respect to variable incentive compensation, the Offer Letter merely states that Plaintiff will be "eligible to earn variable incentive compensation," and the "[d]etails of the Incentive Plan and quota sheet will be provided by your manager." *Id.*

defendant that explicitly included participation in the company's incentive program as part of their total compensation and rewarded employees for "superperforming"). In *Marciniak v. Veritas Technologies LLC*, an unpublished case in the District of Arizona, the court held, based on similar facts to those at issue in this case, that there was a valid contract between the plaintiff and Veritas because "[i]f Plaintiff solicited new business and followed Veritas' guidelines, then Veritas promised to compensate Plaintiff with commissions." *Marciniak v. Veritas Tech's. LLC*, Civ. No. 20-1979, 2023 WL 417634, at *3 (D. Ariz. Jan. 26, 2023). Here, as in *Marciniak*, there was a condition—exceeding quota—that Plaintiff could satisfy to create an obligation on Defendant, namely entitlement to variable pay based on achievement of specific performance objectives. *See* ECF 84-3, at 3 ██████████████████████████████████████████████████████ ██████████████████████████████); *see also id.* ██████████████████████████████ ███████████████████████████████████████████████████████████████ ██████).

The Plan announced a policy of payment in which Defendant retained discretion to modify the quota throughout the fiscal year, subject to the written approval of the CEC, but it did not have absolute discretion in deciding whether to pay the incentive at all. *Cf. Jensen v. IBM Corp.*, 454 F.3d 382, 390 (4th Cir. 2006) (finding no enforceable contract where the sales incentive plan expressly stated, "this program does not constitute a promise by [the company] to make any distributions under it."). In short, in exchange for exceeding his quota, Plaintiff was given incentive compensation, described as "variable pay."[18] Thus, there was mutual assent to sufficiently specific terms because Veritas could not decline to award any compensation if Plaintiff

---

[18] Variable pay is defined in the Plan as: "██████████████████████████████████████████ ████████████████████████████████████ ECF 84-1, at 9.

exceeded his quota at the end of the fiscal year.  *Cf. Korba v. Stanley Black & Decker, Inc.*, Civ. No. DKC-12-1989, 2012 WL 6019570, at *7 (D. Md. Nov. 30, 2012) (finding a contract did not exist where defendant had "unlimited discretion regarding whether to award any bonuses under the [incentive compensation plan]").

Moreover, this type of payment—variable incentive compensation—was explicitly listed in the offer letter as part of Plaintiff's compensation.  ECF 83-3, at 2.  The Court also notes that the Plan's terms and conditions do not expressly state that the Plan is *not* a contract or that it does not create contractual obligations.  ECF 84-1, at 10.  In light of the above, the Court finds that there was a sufficient offer made by Defendant to Plaintiff with respect to incentive compensation. *See* ECF 97-6, at 181 (email from Veritas indicating "Your FY2022 Compensation Plan Details are available for your review and acceptance" and giving an option for employee to "accept" or "decline").  Plaintiff then accepted the terms of the incentive compensation plan in June 2021, which included Defendant's right to modify the quota amount.  ECF 97-6, at 49; ECF 84-12, at 46, 179:2–19.  The Court thus interprets the Plan as creating a binding obligation on Defendant to pay Plaintiff some amount of commission if he exceeded his annual quota, which was subject to written modification by the CEC.[19]  *See* ECF 84-3, at 2–3.  In other words, "variable pay" cannot reasonably be interpreted to mean "no pay" so long as the employee meets specific performance objectives.  *Cf. Windesheim*, 212 F. Supp. 2d at 460 (finding no contract where the incentive plan "clearly reserves the right of the [company] to pay or not pay the incentives in its 'sole discretion'").  As such, the Plan, along with the offer letter, constitutes an enforceable contract entitling Plaintiff to some amount of variable pay.  The Court next turns to whether Defendant

---

[19] This commission is offered as part of the company's incentives.  Incentives are defined as ██████████████████████████████████████████████████████████ "
ECF 84-1, at 6.

breached the contract in modifying Plaintiff's quota (and therefore reducing his commission) after the SSA Deal closed.

   *ii.     Defendant Acted Pursuant to the Terms of the Contract.*

   While the offer letter and Plan create an enforceable contract, the Court finds that there is no dispute of material fact that Defendant acted within its discretion under the express terms in the Plan, and thus, as a matter of law, there is no breach of contract.

   Plaintiff argues that the commission payment vested once Veritas received full payment from SSA on June 10, 2021, and the elements of Section 5.2 were met, and that "once Plaintiff earns his commissions, Veritas is unable to retroactively adjust his quota[.]" ECF 97, at 20–21. Defendant contends that the Plan operates on an annual basis, and Veritas has absolute discretion to modify quotas at any point in the fiscal year, which as a result, will alter entitlement to commission. ECF 83-1, at 22, 24 (citing ECF 84-14, at 57, 225:9–11). Defendant maintains that its actions "did not change [Plaintiff's] entitlement to incentive pay, it changed the amount Veritas ultimately had to pay," which, according to Defendant, is not a breach of contract under Section 5.2 of the Plan. *Id.* at 25.

   The crux of the parties' dispute appears to hinge on whether post-deal quota reviews are treated differently by the terms of the Plan than prospective quota reviews. As relevant here, Section 2.8 of the Plan, states that Veritas "███████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ██████" ECF 84-1, at 12. Section 2.8 also makes clear that any modifications must "████ ███████████████████" *Id.* Similarly, Section 3, titled "Changes to the Plan," reiterates that Veritas "████████████████████████████████████████████████████████

███████████████████████████.” *Id.* at 13.  Section 3 also indicates that ████████████

████████████████████████████████████████████████████████████████████

██████████████████” *Id.* at 14.  In addition, Section 3.1(a) says quotas "████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████████████████████████” *Id.*  The following section, Section 3.2, indicates

that



*Id.* at 15.  The Plan does not contain any language entitling Plaintiff to a specific sum.

The Court finds that Sections 3.1 and 3.2 are dispositive as to whether Defendant retained

discretion to modify quotas at any point during the fiscal year.  There is no genuine dispute over

whether the SSA Deal was forecasted; the record shows it was not.[20]  *See* ECF 84-12, at 40, 154–

55:15–1 (testimony by Moon that he did not know the order was coming and "[t]he quantity was

definitely unexpected"); ECF 83-18, at 2 (email from Moon to Hyde stating "while [the SSA order]

[20] The Court is not persuaded by Plaintiff's argument that he "did in fact forecast the SSA Deal, at
least in part, beginning on June 7, 2019," ECF 97, at 23, given that Plaintiff admitted in his
deposition that he did not forecast the $7.36 million deal or know about it before the SSA placed
the order.  ECF 84-12, at 40, 154:15–17; *see also id.* at 43, 166:6–13 (indicating that he "was
concerned that [the order] could be a mistake because we had not [] been given an expectation that
there would be an order this large").  Moreover, as Defendant explains, the email Plaintiff cites for
this argument shows that Plaintiff "entered an SSA opportunity of $507,900 into OSC as
'pipeline.'  The SSA Deal's final value, however, was $7,360,000.  Thus, Veritas did not consider
it when setting his quota in [] late April/early May due to its low value and pipeline status, but
even if it did, a $507,900 value does not have the material impact on quota setting that a $7.36M
deal does."  ECF 104, at 10 n.4.

is GREAT NEWS, it does of course raise the question about why I didn't have it forecasted"); ECF 97-3, at 46, 182:8–183:6 (testimony by Hyde that she was "stunned" when Moon told her about the SSA Deal); ECF 84-9, at 5–6 (email from O'Connor asking "How far of a jump do we want to allow with this non-forecasted, non-quotaed deal?" and indicating in an earlier email that the SSA Deal "was not in the forecast or pipeline").  Because the deal was not expected or forecasted, it was not considered at the time Plaintiff's quota was initially set.  Sections 3.1 and 3.2 explicitly allow quota adjustments when this occurs.

Plaintiff maintains that "it is only Sections 3.4, 3.5 and 3.6 that address when and how Veritas may conduct such a review *after* the deal has closed," ECF 96, at 25–26 (emphasis in original), and each of these sections provide "████████████████████████████████████████ ████████████████████████████████████"  *Id.* at 25 (citing ECF 84-1, at 16–17).  But the plain language of the Plan does not support this interpretation of the contract because the Plan operates on an annual basis, and other sections of the Plan explicitly reserve Defendant's right to change quotas prospectively or retroactively during the fiscal year.  *See* ECF 84-3, at 2 ("████ ████████████████████████████████████████████████████████████████"); ECF 84-1, at 12 ("██████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████."); *see also* ECF 84-14, at 57, 225:9–11) ("Employees are on an annual plan, so [] all commissions are considered an advance until we close out the annual plan year."); ECF 84-3, at 2–3 ("████ ████████████████████████████████████████████████████████").  The fact that the deal triggered automatic review under various sections of the Plan does not change the analysis.  This is not, as

Plaintiff contends, a matter of specific terms governing general terms.[21]  *See* ECF 96, at 24–25. Rather, Defendant exercised rights clearly reserved to it under the Plan.  Under the Plan, Veritas reserved—at its sole discretion, and without having to provide prior notice—the right to modify all aspects of the Plan, including quotas.  *See* ECF 84-1, at 12, 14, 15.  In other words, regardless of when it recognized revenue for any particular sale, Veritas maintained sole discretion to adjust Plaintiff's quota, and thus as a result, adjust the variable pay.  Plaintiff agreed to these terms when he accepted the Plan in June 2021.  *See* ECF 97-6, at 181; ECF 97-6, at 49; ECF 84-1, at 18.

The Court is not persuaded by Plaintiff's argument that the time limits set forth in Sections 3.4, 3.5, and 3.6 nullify the plain language in Sections 2.8, 3.1, and 3.2 authorizing modification of the quota at any point in the fiscal year.[22]  *See* ECF 96, at 24–28.  Even if Defendant failed to conduct review of a Deal within the requisite time period set forth in these three provisions,

---

[21] Plaintiff acknowledges that Section 3.1 "makes no reference to a 30-day deadline," but avers that the 30-day review period is expressly laid out in Sections 3.4, 3.5, and 3.6, and the specific clause of the written agreement controls the general clause when two clauses are apparently in conflict.  ECF 96, at 24–25.  Defendant maintains that "Sections 3.1 and 3.2 allowed Veritas to increase [] Moon's quota at any time" and "nothing in Sections 3.1 or 3.2 limit *when* Veritas can modify quota."  ECF 83-1, at 22–23 (emphasis in original).

[22] The Court acknowledges that Judge Hazel previously held that "there are competing provisions within the Plan that create ambiguity over whether Defendant retained sole and absolute discretion to amend the Plan at any time," and therefore "the Court may not resolve this ambiguity on a motion to dismiss."  ECF 26, at 16.  However, the Court finds on summary judgment, with the benefit of a full record post-discovery, that there is no genuine dispute of fact for a jury to resolve because Plaintiff conceded that Defendant had the authority to modify his quota "going forward," ECF 84-12, at 74, 290:20–291:2, and deposition testimony from Veritas management, along with the plain text of the Plan, demonstrate that the Plan is administered on an annual, not a quarterly or deal-based, basis, ECF 84-3, at 2, ECF 84-1, at 12, ECF 84-14, at 57, 225:9–11.  The Court is obligated to read the Plan's terms to give effect to as many provisions as possible.  *See Walker v. Dep't of Hum. Res.*, 842 A.2d 53, 61 (Md. 2004) (requiring courts to construe contracts "as a whole, interpret[ing] their separate provisions harmoniously, so that, if possible, all of them may be given effect").  It is clear that Defendant retains discretion to modify quotas at any time during the fiscal year because any other reading of the Plan would nullify the plain language of Sections 2.8, 3.1, and 3.2, which confer discretion to modify quotas at any time subject to the procedures governing modification.

Defendant still had authority under Sections 2.8, 3.1, and 3.2 to prospectively modify the quota. *See* ECF 84-1, at 12, 14, 15.  Indeed, Plaintiff concedes this point.  ECF 84-12, at 74, 290:20–291:2.  As such, the Court is persuaded by Defendant's argument that "all Veritas had to do was change [] Moon's quota in Quarter Four of FY22 to include the increase approved in July [which] [] would not breach any alleged contract, but would have the same effect as the alleged 'retroactive' change to quota [Plaintiff] complains about here because commissions are calculated on a year-to-date basis against annual quota attainment."  ECF 104, at 11.  In other words, under Sections 2.8, 3.1, and 3.2, Defendant could have changed Plaintiff's quota for any reason, subject to written approval of the CEC, during the remainder of the fiscal year, effectively bringing about the same change to the quota that is at issue here, but not directly tying the change to the SSA Deal.  In *Marciniak*, after finding the existence of a contract, the Court "agree[d] [with Veritas] that changes to the annual quota are prospective, as those changes affected what that fiscal year's quota would be and not what a previous fiscal year's quota was."  *Marciniak*, 2023 WL 417634, at *4.  Such an interpretation is faithful to the terms of the Plan and the record, which show that the Plan operates on an annual basis unless otherwise noted.[23]  *See* 84-1, at 7 ("███████████ ██████████████████████████"); ECF 84-3, at 2 ("█████████████████████ ██████████████████████████"); ECF 84-14, at 57, 225:9–11) ("Employees are on an annual plan, so [] all commissions are considered an advance until we close out the annual plan year."[24]); ECF 84-16, at 28, 109:10–11 ("It's an annual plan, we pay them on an annual basis.").

---

[23] Neither party claims that Plaintiff's quota operated on a quarterly basis.  *See* ECF 97-2, at 73–74, 293:18–294:2 ("[Question]: I think you testified earlier in the deposition that it's an annual quota and Veritas breaks it into quarterly targets. [Moon's answer]: Yes. [Question]: Is how you referred to it. So those targets aren't quotas? [Moon]: That's correct.").

[24] Kelie Ginestet, Senior Director of Global Sales Compensation, also testified several other times that the Plan is administered on an annual basis.  *See* ECF 84-14, at 66, 261:7–10 ("[W]e look at

Further, the Court notes that interpreting the Plan as Plaintiff suggests would nullify multiple provisions conferring discretion on the company to modify quotas within a fiscal year, which the Plan terms clearly state in Sections 3.1 and 3.2, as well as in Section 2.8, the governing authority of the plan. *See* ECF 84-1, at 12, 14, 15. Neither Section 3.1 nor 3.2 have a 30-day requirement.[25]  As such, at minimum, Defendant had the authority to modify Plaintiff's quota

---

the plan and manage it on an annual basis and all commissions are not earned until the end of the plan."); *id.* at 68, 269:10–14 ("[y]ou will receive an annual plan, and [commission] is not fully earned until the end of the plan because there are circumstances that could come up during the year that would change the earnings against that plan.").

[25] Even if the Court were to reach the 30-day issue, the Court is not convinced that Sections 3.4, 3.5, and 3.6 require quota modifications resulting from review to take place within 30 days after month-close.  Section 3.4 states that ████████████████████████████████████████ ███████████████████████████████████████  While the provision does indicate that the review " ███████████████████████████████ ████████████████████████," the following paragraph indicates that due to the nature of Veritas' sales, sales process, technologies and incentive compensation administration, " ████████████████████████████████████████ ███████████████████████████████████████████████████████████████ " ECF 84-1, at 16.  The following sentence states: ████████████████████ ████████████████████████████████████████████████████████████████ " *Id.* Given that courts must interpret contracts to give effect to as many provisions as possible, *see Walker*, 842 A.2d at 61, the Court finds that while *review* should occur in 30 days after month-close, the second paragraph makes clear that the *modifications resulting from such a review* need not take place within 30 calendar days after month-close.  This must be the case otherwise the clause acknowledging that modifications are not likely to be made until after the close of the fiscal year would be rendered meaningless.

Sections 3.5 and 3.6 also include caveats that, when read harmoniously, do not require changes to quotas to occur within 30 days after month-close, but rather set a timeline for initiating review. For instance, in Section 3.6, while the ████████████████████████████████ when a Plan Participant's quota attainment █████████████████████████, the sentence also states that ████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████  ECF 84-1, at 17.

under Sections 2.8, 3.1, and 3.2.[26]  Moreover, the ability to make changes to the quota on a go-forward basis is undisputed, *see* ECF 84-12, at 74, 290:20–291:2, and the Plan operates on an annual basis, ECF 84-3, at 2; ECF 84-1, at 12; ECF 84-14, at 57, 225:9–11, thus it is axiomatic that a change could be made to the quota at any point during the fiscal year.  Where an employer exercises rights clearly reserved to it by the contract, there can be no breach of contract.  Accordingly, summary judgment is granted in favor of Defendant on the breach of contract claim as a matter of law.

## 2.    Maryland Wage Payment and Collection Law Claim

The MWPCL "is a statutory cause of action, the purpose of which is to provide a vehicle for employees to collect, and an incentive for employers to pay, back wages."  *Cunningham v. Feinberg*, 107 A.3d 1194, 1202 (Md. 2015).  It requires that "[e]ach employer shall pay an employee . . . all wages due for work that the employee performed before the termination of employment, on or before the day on which the employee would have been paid the wages if the employment had not been terminated."  Md. Code Ann., Lab. & Emp. § 3-505(a).  In applying Section 3-505, courts consider (1) whether the disputed amount constitutes a wage, and (2) if so, whether it is owed to the employee as "wages due."  *Medex v. McCabe*, 811 A.2d 297, 303 (Md. 2002).  The MWPCL defines "wage" as "all compensation that is due to an employee for employment," which can include "a commission."  Md. Code Ann., Lab. & Emp. § 3-501(c)(1) – (2); *Macsherry v. Sparrows Point, LLC*, 973 F.3d 212, 226 n.9 (4th Cir. 2020); *see also Medex*,

---

[26] Daniel Vesek, a Federal Civilian Systems Engineer at Veritas, asserts that the "retroactive revision to [] Moon's and my quota was not in accordance with the customs and practices of Veritas, as based upon my sixteen (16) years of experience with the company, my quota was never retroactively revised following the booking of a deal."  ECF 97-4, at 5.  This assertion is irrelevant.  Lack of adjustment in the past does not nullify the plain language of the Plan, which confirms that quotas can be adjusted at Veritas' sole discretion during the fiscal year.

811 A.2d at 302 ("Commissions are clearly within the scope of the [MWPCL]."). For a commission to count as a "wage," however, "the employee must have been promised the particular form of compensation as remuneration for his labor." *Varghese v. Honeywell Int'l Inc.*, 424 F.3d 411, 418 (4th Cir. 2005); *Whiting-Turner Contracting Co. v. Fitzpatrick*, 783 A.2d 667, 671–72 (Md. 2001) ("[T]he wages which an employee is due, and which must be paid . . . consist of all compensation, and any other remuneration, that the employee was promised in exchange for his work. In other words . . . to be wages, to be included within the statute, the payment must have been promised to the employee as compensation for work performed." (internal quotation marks omitted)); *cf. Medex*, 811 A.2d at 302 ("We have held that it is the exchange of remuneration for the employee's work that is crucial to the determination that compensation constitutes a wage. Where the payments are dependent on conditions other than the employee's efforts, they lie outside the definition.").

Defendant argues that because the Plan is based on annual quotas, all changes to quotas in a fiscal year are necessarily prospective changes, so the earnings do not vest until the end of the fiscal year and there cannot be any back wages owed to Plaintiff. ECF 83-1, at 27. Plaintiff argues that Defendant is "not permitted by its own Plan to deprive [Plaintiff] of commissions after the fact which have been vested and earned." ECF 97, at 22. Plaintiff maintains that "reading Section 3.1 and 3.2 with 5.2 of the Plan together, once Plaintiff earns his commissions, Veritas is unable to retroactively adjust his quota in Maryland." ECF 97, at 21 (citing *Medex,* 811 A.2d at 304 ("[W]here an employee earns wages under the Act, the employer must pay them.")).

Section 5.2 of the Plan states,



ECF 84-2, at 6. Under Defendant's interpretation of this provision, "Section 5.2 lists three conditions precedent which, when met, entitles a Plan Participant to variable pay." ECF 83-1, at 24 (citing ECF 84-2, at 6). According to Defendant, Section 5.2 does not "obligate Veritas to pay commission in a specific amount or eliminate Veritas' authority to make modifications to the Plan that ultimately affect the amount Veritas must pay" because the Plan is an annual Plan and "there are circumstances written into the FY22 Plan (like windfalls) that could arise at any point that could change the total *amount* of variable pay due." *Id.* (emphasis in original) (citing ECF 84-2, at 6, and ECF 84-14, at 68, 269:10–14). Plaintiff asserts that under Section 5.2, "████

███████████████████████████████████████████

███████████████████████████████" ECF 97, at 29 (citing ECF 84-2, at 6; ECF 84-14, at 65, 255:13–19, 256:19–20).

The Plan terms make clear that vesting occurs at the end of the fiscal year. *See* ECF 84-2, at 6 (explaining that "████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████"); *id.* ("████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████"); ECF 84-1, at 9 (describing variable pay as "████████

███████████████████████████████████████████████████████████

███████████████████████████████████████ "); *id.* at 7 (describing quota as ████████████

███████████████████████████████████████████████████████████

██████████████████ ).  As previously established, record evidence also shows that the Plan operates

on an annual basis.  ECF 84-14, at 66, 259:10–11, 260:5–8 ("[S]o until the plan is completed for

that year annually, those [commissions] are not earned, because we issue an annual plan.  So

technically, those are not earned."); ECF 84-16, at 28, 109:10–11 ("It's an annual plan, we pay

them on an annual basis.").[27]

What is more, the Fourth Circuit's decision in *Martignetti v. International Business

Machines Corporation,* informs Plaintiff's MWPCL claim.[28]  855 F. App'x 857 (4th Cir. 2021).

In *Martignetti,* the Fourth Circuit, in an unpublished opinion, held that a discretionary bonus is not

considered a wage.  *Id.* at 861.  There, defendant expressly reserved the right to adjust the terms

of its incentive plan and to modify or cancel the plan.  *Id.* at 859.  When the defendant employer

unilaterally and retroactively capped the plaintiff employee's commissions, allegedly denying him

$526,000, he filed suit.  *Id.*  The Fourth Circuit affirmed dismissal of his MWPCL claim, holding

that the "plain language [of the plan] . . . precludes counting the specific commission amounts he

---

[27] While the Plan defines incentive payments as █████████████████████████

████████████████████████████ " the Court is obligated to consider the language of the contract as a
whole.  *See Nova Research, Inc. v. Penske Truck Leasing Co.*, 952 A.2d 275, 283 (Md. 2008) ("In
interpreting a contract provision, we look to the entire language of the agreement, not merely a
portion thereof.").  The Court is not persuaded that this isolated definition can be construed to
mean that commission from a specific deal irrevocably vests as soon as these two conditions are
met, thus nullifying the explicit disclaimers in the Plan reserving Veritas' right to adjust quotas.
The aforementioned provisions and record evidence make clear that the Plan operates on an annual
basis and there is no promise of payment until the end of the Plan period.

[28] The Court notes that this case was on appeal from the district court's grant of dismissal, not
grant of summary judgment.

seeks as 'wages' under the MWPCL." *Id.* at 861.  The court reasoned that the defendant "did not

make a binding promise to pay [the plaintiff] a particular rate of commission in exchange for his

work." *Id.*  Instead, the plan "repeatedly and unreservedly" stated that defendant could adjust the

amount of any commission at its "sole discretion." *Id.*  The Fourth Circuit thus rejected the

argument that defendant was not allowed to reduce commissions because defendant reserved "sole

discretion as to what amounts are distributed to employees as earned commissions." *Id.*

Similarly, here, the Plan terms reveal that Plaintiff was entitled to "variable pay," not a

specific sum. *See* ECF 84-3, at 2 ("███████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████").  Thus, the Plan disclaimed that Defendant was undertaking any contractual

obligation to pay Plaintiff any *particular amount* of money and gave Defendant the right to review

the formulaic amount of incentive compensation before Plaintiff received it and to adjust it if, in

Defendant's sole discretion, the amount was disproportionate as a result of, *inter alia*, error,

unforeseen circumstances, or windfall. *See id.* (indicating "████████████████████████

████████████");  *see also Hoffeld v. Shepherd Elec. Co.*, 932 A.2d at 1197, 1207 (Md. App.

2007) ("Whether an employee has earned a commission depends on the terms of employment.").

Critically, this is not a case where Defendant modified Plaintiff's quota to such a degree

that he received no commission payment for the deal, or his compensation was conditioned on a

provision antithetical to public policy.  *See MedEx,* 811 A.2d at 305 (holding that a contractual

provision that allowed an employer to deny payment of earned incentive payments to an employee

who had left the company was unenforceable under the MWPCL); *Hausfeld v. Love Funding

Corp.*, 131 F. Supp. 3d 443, 461 (D. Md. 2015) (same).  Rather, Plaintiff earned $██████ in

commission on the deal.[29]  ECF 84-11, at 2; ECF 83-30, at 2; ECF 83-27, at 17.  The exact amount

that Plaintiff was entitled to was within the sole discretion of Defendant because the Plan terms

explicitly reserve Defendant's right to modify quotas within the fiscal year.  *See* ECF 84-1, at 12,

14–15.

While there is a dispute over whether Sections 3.4, 3.5, and 3.6 mandate that review occur

30-days after the month-close and whether the deadline by which to review was end of June 2021

or end of July 2021, the Court, as described above, finds that the authority to modify quotas at any

point during the fiscal year does not derive exclusively, or even primarily, from these three

sections.  Further, the terms are clear that the earnings vest at the end of the fiscal year.  *See* ECF

84-1, at 18 ("▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.");  *see also* ECF 84-1, at 7 (describing that quotas are

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮).  While there are exceptions to the annual quota, neither

party contends that Plaintiff was subjected to a quota assigned on a quarterly basis.  *See* ECF 97-

2, at 73–74, 293:18–294:2.

At minimum, Defendant reserved discretion to modify the quota at any time during the

fiscal year under Sections 3.1 and 3.2.  Plaintiff concedes that neither of these sections is subject

to the 30-day review period.  *See* ECF 97, at 24 ("[I]t is true that Section 3.1 itself makes no

---

[29] Had Defendant entirely withheld compensation in the form of commission pay for the SSA Deal, the result may be different because, as discussed above, Plaintiff was entitled to variable pay if he exceeded quota.  But those are not the facts before this Court.  The Court interprets the Plan as creating a binding obligation on Defendant to pay Plaintiff *some amount* of commission based on an annual quota (which was subject to written modification by the CEC).  As previously established, "variable pay" cannot reasonably be interpreted to mean "no pay."  Here, however, Plaintiff does not dispute that he was paid commission; rather, he maintains that he was entitled to more commission than he received.  This interpretation is unsupported by the plain terms of the Plan, which make clear that Veritas never promised payments at a specific commission rate.  *See Martignetti*, 855 F. App'x at 861.

reference to a 30-day deadline[.]"); *id.* at 25 ("Section 3.2 contains no time limit[.]").  Therefore, the plain language of Sections 3.1 and 3.2 are dispositive, and the Court holds as a matter of law that Defendant retained discretion to change the quota and thus adjust the amount of incentive compensation at any point in the fiscal year, subject to the written approval of the CEC.

Plaintiff also argues that "even if the Plan were to contain such an escape hatch allowing Veritas retroactively to divest employees of earned wages, it would be void as an impermissible effort to contract around the MWPCL."  ECF 96, at 29.  However, the cases Plaintiff cites for this proposition are unpersuasive as they deal with striking contractual provisions requiring employees to continue to be employed through the date when commissions are actually paid in order to remain eligible for receipt of those commissions.  *See Medex*, 811 A.2d at 297 (holding that an employer may not refuse to pay commissions earned by an employee simply because the employee no longer works for the employer, even when a written employment agreement explicitly conditions payment of such commissions on continued employment); *see also Hausfeld*, 131 F. Supp. 3d at 461 (holding that plaintiff is entitled to deferred commission under the MWPCL notwithstanding defendant's attempt to condition payment on continued employment).  In those cases, the entire sum of the commission was withheld, and critically, the earnings had already vested.  *See Medex,* 811 A.2d at 302 (finding that "the incentive fees were related directly to sales made by the employees during a defined fiscal year," and "McCabe had performed all the work necessary to earn the fees, and Medex had registered the sales"); *Hausfeld*, 131 F. Supp. 3d at 461 ("[T]here is no dispute that the deferred commission was already earned.").  Those cases are simply not analogous to the circumstances present here, where Defendant did pay Plaintiff a commission, but modified the amount before doing so, which was expressly authorized by the Plan.  Additionally, Plaintiff's earnings had not yet "vested," for the purposes of the MWPCL because quotas are

assigned on an annual basis. Thus, Plaintiff had not, as he contends, "complet[ed] [] all legitimate job functions necessary to earn the commission." ECF 97, at 29 (citation omitted). Here, the commission at issue was part of an annual quota, not a deal-based commission plan, and the quota was adjusted before the fiscal year ended, pursuant to the express terms in the Plan authorizing such modifications. *See Marciniak*, 2023 WL 417634, at *4. The Court cannot hold that Plaintiff did "everything required to earn the commission at issue," ECF 97, at 30, such that his right to compensation vested in May 2021 because the commission he earned from the SSA Deal was only one part of a larger, annual quota, and the resulting commission from that quota vested at the end of the fiscal year. *See* ECF 84-2, at 6 (explaining "                              ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮"). The commission Plaintiff was entitled to as a result of the quota thus did not, and could not, vest until the fiscal year ended. *See* ECF 84-1, at 9 (describing variable pay as ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮"); *id.* at 7 (explaining that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮"); ECF 84-14, at 66, 259:10–11, 260:5–8 ("[U]ntil the plan is completed for that year annually, those [commissions] are not earned, because we issue an annual plan. So technically, those are not earned."). Because Defendant retained discretion to modify quotas at any point during the fiscal year, incentive pay was not "earned" until the end of the fiscal year. Thus, the difference between the amount Plaintiff was paid based on the revised quota and the amount he claims he should have been paid based on the initial quota does not constitute a wage under § 3–501(c) of the MWPCL.[30] Accordingly, there

---

[30] The Court declines to address the additional arguments raised by the Defendant, including ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *See* ECF 83-1, at 28–30. In light of the Court's decision that Defendant acted pursuant to its authority set forth in the express terms of the contract,

are no "wages due" to Plaintiff and summary judgment is granted to Defendant on the MWPCL claim.

### 3.    Quantum Meruit / Unjust Enrichment Claim

To recover under a quasi-contractual quantum meruit theory, which is identical to unjust enrichment, a plaintiff must establish: (1) a benefit conferred on the defendant by the plaintiff; (2) an appreciation or knowledge by the defendant of the benefit; and (3) the acceptance or retention by the defendant of the benefit under such circumstances as to make it inequitable for the defendant to retain the benefit without the payment of its value. *Hill v. Cross Country Settlements, LLC*, 936 A.2d 343, 351 (Md. 2007); *Swedish Civil Aviation Admin. v. Project Mgmt. Enters., Inc.*, 190 F. Supp. 2d 785, 792 (D. Md. 2002). Because this claim is quasi-contractual, it generally cannot arise when a valid contract exists between the parties concerning the same subject matter. *See Cnty. Comm'rs of Caroline Cnty. v. J. Roland Dashiell & Sons, Inc.*, 747 A.2d 600, 610 (Md. 2000).

The parties have acknowledged that if the Plan is an enforceable contract, the quantum meruit/unjust enrichment claim is moot. *See* ECF 83-1, at 30; ECF 18 (Plaintiff's response in opposition to motion to dismiss), at 28 (pleading claim in the alternative). Where, as here, the work for which Plaintiff believes he is entitled to commissions is no different from the work he performed under the written contract, Plaintiff cannot bring a claim for unjust enrichment under Maryland law. *See Janusz v. Gilliam*, 947 A.2d 560, 567 (Md. 2008) ("In Maryland, a claim of unjust enrichment, which is a quasi-contract claim, may not be brought where the subject matter of the claim is covered by an express contract between the parties.") (citation and internal quotation marks omitted); *County Comm'rs*, 747 A.2d at 610 ("We hold that, generally, quasi-contract

the question ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉
▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ need not be reached.

claims such as quantum meruit and unjust enrichment cannot be asserted when an express contract defining the rights and remedies of the parties exists."); *see also FLF, Inc. v. World Publications, Inc.*, 999 F. Supp. 640, 642 (D. Md. 1998) ("It is settled law in Maryland, and elsewhere, that a claim for unjust enrichment may not be brought where the subject matter of the claim is covered by an express contract between the parties."). As such, summary judgment is granted to Defendant on this claim.

## IV.   CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment, ECF 83, is granted. The Clerk is directed to close this case.

A separate implementing Order will issue.

Dated: <u>December 27, 2024</u>                                 <u>          /s/          </u>
                                                                                 Brendan A. Hurson
                                                                                 United States District Judge